**In the Matter of Clayton P. GIBSON.**

**No. 7686.**

United States District Court,
S. D. Mississippi,
Jackson Division.

Oct. 20, 1971.

A. Spencer Gilbert, III, Jackson, Miss., for appellants.

Dale Danks, Jr., Robert G. Nichols, Jr., Jackson, Miss., for appellees.

RULING ON REVIEW FROM REFER-
EES' DENIAL OF OPPOSITION
TO DISCHARGE

NIXON, District Judge.

Citizens and Southern National Bank of Atlanta, Georgia (C & S Bank), Con-

goleum Industries, Inc., Crompton-Richmond Company, Inc. and Trust Company of Georgia, four of the seven original objecting creditors of the bankrupt, Clayton P. Gibson, filed this Petition for Review of the Referee's Order of November 13, 1970, which was based upon his Findings of Fact and Conclusions of Law dated November 6, 1970 overruling their Specifications of Objections to Discharge. The facts which gave rise to this dispute will be succinctly and concisely set forth below.

On August 11, 1969, Clayton P. Gibson, President and sole stockholder of Gibson Flooring and Supply, Inc. (the bankrupt corporation), filed on behalf of the corporation a Petition for an Arrangement under Chapter XI of the Bankruptcy Act. No plan of arrangement was approved, and the petition of the corporation was converted into a "straight bankruptcy" proceeding under Bankruptcy No. 7551. Petitions for personal bankruptcy were then filed by Gibson and his wife, Jane P. Gibson, under Bankruptcy Nos. 7686 and 7687, respectively.

The above three bankruptcy proceedings required several different hearings, which included recorded testimony and the receipt of documentary evidence. The first hearing was held on August 20, 1969 on the Petition of Ralph Wilson Plastic's Company for Indemnity; the Hearing of Creditors was held on September 10, 1969; and the Section 21–A Hearing was held on January 27, 1970. At the conclusion of the hearings, the Referee sustained a Motion to Dismiss the Objection to the Discharge of Jane P. Gibson.

Seven creditors of the bankrupt, Clayton P. Gibson, including the four petitioners herein, then filed their Specifications of Objections to his Discharge, and a hearing on those Objections was commenced on April 22, 1970 and concluded on June 2, 1970. During the hearing of June 2, it was agreed that all recorded testimony and evidence presented during all of the above hearings would be considered by the Referee in ruling on the Objections to Discharge.

In his Findings of Fact and Conclusions of Law, the Referee by Order of November 13, 1970 overruled the Specifications of Objections to Discharge. The four petitioners then filed their Petition for Review herein on December 3, 1970 within the extended time allowed by Order of the Referee, upon Motion duly made before the expiration of the original ten day period.

The petitioners here, as they did before the Referee, base their Objections to the Discharge of the bankrupt on three provisions of § 14(c) of the Bankruptcy Act (11 U.S.C. § 32(c)), namely:

(1) making and publishing a false financial statement, based on which a creditor extended credit to the bankrupt's business in violation of § 14(c)(3);

(2) failing to explain satisfactorily losses and deficiencies of assets in violation of § 14(c)(7); and

(3) failing to keep books of account or records from which his financial condition and business transactions might be ascertained, in violation of § 14(c)(2).

The Referee found adversely to the petitioners on all three questions. The petitioners contend that the evidence is such that there exists at least "reasonable grounds for believing" that the bankrupt violated each of the above provisions of § 14(c), and therefore the burden shifted to Gibson to prove convincingly to the Court that he did not commit these violations. It is further alleged that he failed to meet this burden, and thus the Order of the Referee should be reversed and Gibson denied a discharge.

I.

Section 14(c)(3) of the Bankruptcy Act (11 U.S.C. § 32(c)(3)), which the petitioners first contend precludes the discharge granted by the Referee, provides:

"(c) The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) while engaged in business as a sole proprietor, part-

nership, or as an executive of a corporation, obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation * * * "

It is the contention of the petitioners that Gibson obtained credit for his corporation by causing to be made and published a written financial statement of the corporation that was materially false, or stated differently, that he gave the erroneous financial statement intentionally for the purpose of fraudulently deceiving the petitioners so that they would extend credit to his corporation; and also, that one of the petitioners, the Citizens and Southern National Bank of Atlanta, Georgia, extended credit based upon this alleged materially false financial statement.

Contradictorily, Gibson contends that the financial statement was based upon information furnished by those in charge of his corporation's permanent bookkeeping department to Paul M. Jorgenson, a certified public accountant, who Gibson employed to prepare, and who actually prepared and submitted the unaudited financial statement in question, as well as tax returns for the corporation including one on August 30, 1968. He further testified that he relied upon the competency of his bookkeepers and certified public accountant and that at the time he submitted the statement he did not believe any portion thereof to be false.

All four of the petitioning creditors have the right to oppose this discharge on the basis of the allegation that credit was fraudulently obtained from only one of them by the use of Gibson's August 31, 1968 financial statement. Collier on Bankruptcy, ¶ 14.35, p. 1380, fn. 2, and ¶ 14.42, pp. 1404–1405.

After careful study of the case and having had the benefit of observing the witnesses and judging their credibility during the proceeding in the Bankruptcy Court, the able Referee found:

"That Gibson was unknowledgeable about sound business practices and particularly in his understanding or comprehension of his business's accounting procedures or bookkeeping system.

\* \* \* \* \* \*

"That even though Gibson's books and records may have been carelessly or ineptly maintained, particularly with respect to inventory and accounts receivable, nevertheless close study by one trained in recognized business accounting procedures could have ascertained the financial condition of the bankrupt corporation . . .

"That Gibson at no time during the operation of his business willfully or purposely committed any act or intended to deceive or defraud his creditors.

"It is the opinion of the Court on the basis of the foregoing findings of fact that Gibson was ill equipped by training, education and experience to own and manage the type of business that he operated . . .

\* \* \* \* \* \*

"This Court is of the opinion that objectors failed to establish by the required degree of proof an intent on the part of the bankrupt to defraud or deceive his creditors by the issuance of a false financial statement."

Mr. John Wilzman, Assistant Factoring Officer of the C & S Bank received a copy of Gibson's corporation's August 31, 1968 financial statement on or about the 1st of January, 1969, and received a Dunn and Bradstreet Credit Report on the corporation dated January 23, 1969, which clearly showed it to be slow in paying its debts and clearly reflected that its accounts receivable were sluggish. In reliance both upon the financial statement and the Dunn and Bradstreet Report, the C & S Bank on February 4, 1969, agreed to extend $23,000 of credit to the corporate bankrupt provided Gib-

son would sign a personal guaranty agreement in favor of the bank, which he did on February 27, 1969 and delivered on March 3, 1969. Without sending anyone to inspect the business house of the corporate bankrupt or taking any sampling of the accounts receivable, despite the fact that it had received a copy of the financial statement in question in October, 1968, the bank extended credit to the corporate bankrupt in the amount of $16,920 on March 10, 1969 and $2,327 on April 17, 1969. It was established that this credit was extended in reliance on the correctness of the August 31, 1968 financial statement and on the Dunn and Bradstreet Report, but only after requiring and receiving the executed personal guaranty of Gibson. Moreover, the inexperience and ineptness of Gibson as a businessman was or should have been known to all parties, including the C & S Bank through Wilzman.

In order to successfully object to a discharge under § 14(c)(3) of the Act, the creditor or creditors urging the objection must prove that the bankrupt:

"(1) obtained money or property on credit or an extension or renewal of credit; (2) that he did so on a materially false statement respecting its financial condition; (3) that such statement was in writing; (4) that the statement was made or published, or caused to be made or published by the bankrupt or someone duly authorized by him; and (5), under the 1960 amendment, that the bankrupt was engaged in business and the money was obtained for the business. *The determination of a case will often depend largely on its own particular facts.*" Collier on Bankruptcy, ¶ 14.26 (Emphasis supplied).

The initial inquiry is whether the bankrupt fraudulently issued a materially false statement concerning its financial condition with intent to deceive. The well established rule which is here applicable is:

"Intent; Meaning of Word 'False.'

It has been held that an intent to defraud is essential; the word 'false' means more than erroneous or untrue and imports an intention to deceive, and a materially false statement in writing must have been knowingly or intentionally untrue to bar a discharge. Intention to deceive is always material as an element of proof, and, by the weight of authority, such intent is an essential element." Collier on Bankruptcy, ¶ 14.40; see *In Re Hippler,* 278 F.Supp. 753, 755 (W.D.La., 1968).

The bankrupt concedes that the August 31, 1968 financial statement which was prepared on the same day that his Federal income tax return was prepared by the same certified public accountant from books and records furnished by Gibson for the corporation, and which was signed by Gibson and his accountant, was incorrect or erroneous and differed from the tax return. Specifically, the financial statement reflected the following, as of August 31, 1968:

| | |
|---|---|
| Inventory | $204,236.23 |
| Accounts Receivable | $241,224.31 |
| Net Profit | $ 73,434.59 |
| Retained Earnings | $ 41,062.26 |

The Federal income tax return showed the following as of August 31, 1968:

| | |
|---|---|
| Inventory | $169,708.32 |
| Accounts Receivable | $230,436.27 |
| Net Profit | $ 28,118.64 |
| Retained Earnings | $ 4,253.69 (deficit) |

Therefore, the amounts set forth in the financial statement were greater than those set forth in the income tax return as follows:

| | |
|---|---|
| Inventory | $ 34,527.91 |
| Accounts Receivable | $ 10,788.04 |
| Net Profit | $ 45,315.95 |
| Retained Earnings | $ 45,315.95 |

This Court, having reviewed the entire record, and being conscious of the applicable rule that Findings of Fact made by the Referee are to be set aside only where they are clearly erroneous, is of the opinion that such is not the case here. This Court is in complete accord with the finding of the Referee that on

the facts of this case, § 14(c)(3) of the Act did not bar the subject discharge. Although there are reasonable grounds for believing that the bankrupt committed the alleged act, nevertheless he proved by a preponderance of the evidence that he had no fraudulent intent, particularly in view of the fact that he was an inexperienced businessman, and that he had a full time bookkeeping department upon which he relied and which evidently made an honest mistake in furnishing information to the certified public accountant employed by the bankrupt to prepare what was clearly shown to be an "unaudited" financial statement; furthermore, the C & S Bank, one of the largest banking institutions in the South, fully equipped with every possible resource properly to issue credit and which had a Dunn and Bradstreet Report evidencing the bankrupt corporation's slow payment of accounts and sluggish inventory, made no effort whatsoever to determine the correctness of the financial statement and required Gibson to personally guarantee the amounts which it loaned to the corporation.

As the Court said in *In re Hippler,* *supra,* at page 755:

"We are not dealing here with an unsophisticated supplier of goods, and we feel that the Referee reached an altogether reasonable conclusion in light of the fact that Uniroyal is a nationwide merchandiser, fully equipped with every possible resource properly to issue credit. Indeed, as we have noted, the statement itself clearly establishes that it was an estimated declaration of condition as of February 1, 1966, and was not represented as a complete picture of current status based upon business records.

"Uniroyal has failed completely to establish that the financial statement was issued by the bankrupt with intent to defraud; and, indeed, the bankrupt has shown, more than adequately and by a preponderance of the evidence, that he had no such intent. The ruling by the Referee is in all respects affirmed."

The facts of this case show that Clayton Gibson, President of the bankrupt corporation, had taken the steps he thought necessary to maintain what he considered to be adequate records; that he had at least two persons posting his books and employed a certified public accountant to build his statements and tax returns. Although he knew so little of bookkeeping procedures it moved Jorgenson, the certified public accountant, to state: "He was not record conscious" (Tr. 6/2/70, p. 14), the bankrupt still made an effort to conduct his business along accepted lines. Wilzman admitted that he knew the financial statement of August 31, 1968 was "unaudited" (Tr. 4/22/70, p. 49) and that he understood the meaning of that term when it appeared on a financial statement. Gibson was not so clever or canny as to devise a financial statement which was intended to mislead or could mislead the factoring department of one of the largest banks in the Southern part of the United States. Thus, this Court finds that the Referee's finding that the bankrupt met his burden of proving by a preponderance of the evidence the absence of any intent to defraud or deceive in the preparation or delivery to the C & S Bank of his financial statement of August 31, 1968 was not clearly erroneous. See *Wolfe v. Tri-State Insurance Company,* 407 F.2d 16 (10th Cir., 1969), reh. den.; *Baash-Ross Tool Co., et al. v. Stephens,* 73 F.2d 902 (9th Cir., 1934).

The second ground for Objection to Discharge is that the bankrupt failed to satisfactorily explain losses and deficiencies of his assets, and thus is barred from discharge because of the provisions of § 14(c)(7) of the Act.

The Referee in ¶¶ 12 and 13 of his Findings of Fact found that Gibson was unknowledgeable about sound business practices and particularly with respect to his understanding or comprehension of his business' accounting procedures and bookkeeping system, and that the evidence does not show that Gibson failed to satisfactorily explain losses and deficiencies of assets alleged by the objectors. On pages 8, et seq. of the Memo-

randum Brief of the Creditors filed on July 10, 1970 with the Bankruptcy Court in support of their Objections to the Discharge, it is contended that Appendix "A" thereto, a table showing the inventory of the bankrupt corporation recorded by Gibson on certain dates, indicates a great discrepancy among the various figures indicating "traumatic decreases" in inventory which was the primary asset of the corporation and that the bankrupt failed to offer a satisfactory explanation of these large-scale decreases which it was his burden to prove in view of the fact that reasonable grounds exist for believing that he has failed to explain satisfactorily the losses and deficiencies of assets. Collier on Bankruptcy, ¶ 14.60, pp. 1434–1436.

The August 31, 1968 balance sheet shows the corporation had an inventory of $204,236.23. The operating statement filed with the Bankruptcy Petition showed that on the following day, September 1, 1968, the inventory was $169,708.32. Gibson could not explain this decrease because of his lack of knowledge of bookkeeping procedures and business acumen, which is very typical of those who must declare bankruptcy or be involuntarily placed therein, and for whose benefit the Act was primarily enacted so that they may have another chance in life to make a living for themselves and their families. However, Jorgenson, the certified public accountant, did reduce this inventory figure for income tax purposes for the reasons stated by him on pages 41–44 of the Transcript of the § 21(a) hearing on January 27, 1970.

In the corporation's Petition in Bankruptcy No. 7551, the inventory was *estimated* to be $270,000 on August 11, 1969, but on August 13, 1969, the date the Receiver was appointed, the inventory was found to be $133,147.52. It is noted by the Court that the August 11th figure was only an estimated figure and that the record-keeping procedure of the corporation was, to say the least, haphazard and less than adequate. At the first meeting of the creditors, Mr. Gibson was asked to explain the difference in the following inventory figures: $296,009.61 as of May 31, 1969; $270,000 as of August 11, 1969; and $133,147.52 as of August 13, 1969. Because of his lack of education, lack of business sense, an apparently inadequate bookkeeping system, and his reliance upon his bookkeeping department and services rendered by the certified public accountant, he was unable to do so.

The creditors also contend that Gibson failed to explain why he was unable to pay his debts when the books of the corporation showed a net operating profit of $26,000 on the statement attached to his sworn petition filed in Chapter XI proceeding. His only explanation was that this profit was used "for paying my bills" (Tr. 37, 9/10/69). Again he stated "I imagine I paid some debts but that's all I can figure happened to it." (Tr. 165, 4/22/70).

This Court, based upon an exhaustive review of the entire record before it, keeping in mind also that questions of this type are for the most part questions of fact and that the Referee's Findings of Fact, based on his observations of the witnesses as the "Trial Judge" of these matters is to be given great weight and are not to be reversed unless clearly erroneous, finds that his determination that § 14(c)(7) did not bar the bankrupt's discharge is not clearly erroneous.

The following language in the case of *Wolfe v. Tri-State Insurance Company, supra,* at page 20 is apropos:

"... The primary purpose of the Act is to give an unfortunate businessman, who has failed, a chance to start anew, a chance to profit by his own mistakes. Otherwise, he could hardly engage in business at all. The bankrupt may have, and usually has, made mistakes. Mistakes are inevitable, but may be corrected, and knowledge gained thereby.

\*　\*　\*　\*　\*　\*

"Appellants relied on a certified public accountant. Was that wrong? Every businessman of any consequence in this country relies on such account-

ants, as do most of the government agencies, local, state, and national. Many of them otherwise would not know their own financial condition. They rely on them in making financial statements and reports. Certified public accountancy is a profession. If a businessman is required to check the trained accountant, why employ him in the first place? Why not rely on a good bookkeeper who would be much less expensive? No, reliance on trained, licensed public accountants is almost universal. It has become the custom of the trade."

The petitioners contend that § 14(c)(2) precludes the discharge of the corporate bankrupt herein. This section provides that the bankrupt shall not be granted his discharge when he has "destroyed, mutilated, falsified, concealed, or failed to keep or preserve books of account or records, from which his financial condition and business transactions might be ascertained . . ."

The petitioners candidly admit on page 13 of their brief filed before the Bankruptcy Court on July 10, 1970 this issue is a question of fact to be determined under all relevant circumstances. There is no evidence in this record that the bankrupt destroyed or concealed any records, and this Court has already found that the petitioner did not "falsify" any books or records from which his financial condition and business transactions might be ascertained. Therefore, the only question is whether he failed to keep or preserve books of account or records for the purpose of ascertaining his financial condition and business transactions. The Referee, in his Conclusions of Law found that Gibson was ill-equipped by training, education and experience to own and manage the type of business that he operated but that he did keep books of account and records

from which his financial condition might be ascertained. The corporation through its President and sole stockholder, Gibson, had a bookkeeping department employing at least two full time bookkeepers. The evidence shows that the records were inaccurate in certain material respects but this seems to be because of the lack of know-how or training of the bookkeepers themselves or mistakes honestly made by them and relied upon by Gibson who had no knowledge whatsoever of bookkeeping procedure and who was, to say the least, a very poor businessman. Gibson further hired a certified public accountant to help take fiscal inventories of the corporation's assets and to prepare tax returns and financial statements for the corporation.

Finally, the petitioners contend that the Referee based his Findings upon an erroneous assumption that the petitioners had the burden of proving either one or all of the three grounds upon which they rely in opposition to the discharge in bankruptcy, whereas the evidence and the circumstances of this case shifted the burden of proof to the bankrupt. This Court does not find any merit to this contention. Although the Referee might have not clearly stated the basis of his Findings, this Court ascertains from a complete reading of his Findings of Fact and Conclusions of Law and his Order, that he applied the correct test or standard and that his Findings of Fact were and are not clearly erroneous under all the facts and circumstances of this case, and for this reason and the salutary purpose of the Bankruptcy Act, namely, to give relief to creditors such as the one before this Court, the bankrupt has shown by a preponderance of the evidence that he is entitled to a discharge in bankruptcy and is not precluded therefrom by any provisions of § 14(c) of the Act. The ruling of the Referee is in all respects affirmed.